```
            UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI,
                   WESTERN DIVISION
```

KRISTEN ANDERSON, ET AL.                                PLAINTIFFS

VERSUS                          CIVIL ACTION NO. 5:07cv137-DCB-JMR

THE WACKENHUT CORPORATION                                DEFENDANT

## OPINION AND ORDER

This matter comes before the Court on the defendant's Motion for Summary Judgment [**docket entry nos. 17, 44**] and the plaintiffs' Motion for Partial Summary Judgment [**docket entry no. 43**]. Having carefully considered the Motions, memoranda in support and opposition thereof, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds and orders as follows:

### I. BACKGROUND AND PROCEDURAL HISTORY

The plaintiffs in this case are 102 security guards ("plaintiffs" or "officers") who are employed by the defendant, The Wackenhut Corporation ("defendant" or "Wackenhut"), at the Grand Gulf Nuclear Power Station ("Grand Gulf") near Port Gibson, Mississippi.  The plaintiffs bring this claim for unpaid wages and liquidated damages under the Fair Labor Standards Act ("FLSA").

Grand Gulf employs Wackenhut to provide security services for its Port Gibson facility.  Wackenhut, in turn, handles the hiring, training, supervision and administration of the security guards at

the facility.

Wackenhut security officers work one of two types of schedules. The first option is a "seven day off" schedule, where officers work four twelve-hour shifts one week and three twelve-hour shifts the next week. Officers are paid overtime for the hours during the four-day week where they work over forty hours. The second option is the "power squad", where officers work four ten-hour shifts per week. Officers generally work exclusively on either the "seven day off" schedule or the "power squad" schedule.

### A.  *Pre-Shift Procedures*

At Grand Gulf, security officers are required to wear certain protective gear including guns, ammunition, handcuffs, pepper spray and so forth, during their shifts. The daily donning process for this protective equipment involves several steps. Prior to April 3, 2006, the generally followed donning process was as follows:

- A security officer was permitted either to take his or her gun belt home or leave it in a locker on the Grand Gulf premises.
- Upon arrival at work, the officer entered the armory where the guns were stored. More than one officer could enter the armory at the same time.
- Inside the armory, there was a red line on the floor between the officers and the weapons. Only one officer could cross the red line at a time.
- When it was his or her turn to cross the line, the officer would show three credentials: identification, security officer license, and weapons card.
- After showing these credentials, the officer would sign for and receive his or her duty keys.
- The officer would then insert his or her weapons card into a slot and retrieve a weapon, gas mask, pepper spray, flashlight and handcuffs.

- The officer would then receive ammunition from the Armory Supervisor.
- The officer next would check his or her gun at a "clearing box."
- The officer then loaded his or her weapon and placed it in position on the weapons belt.
- The officer then would be checked one additional time before leaving the armory.

William Carraway Dep. 29:1-45:20, Aug. 7, 2008. The parties are in agreement that, once across the red line inside the armory, the average time to complete the process did not exceed 5 minutes per person. Def.'s Memo. in Support of Mot. Summ. J. 5 ("For most Plaintiffs, it was less than a five minute process."); Pls.' Memo. in Support of Mot. Summ. J. 8 ("The process took on average 2-3 minutes per person.").

The armory opened approximately one-half hour prior to the scheduled start time for each shift, and Wackenhut acknowledges that guards were expected to arrive at the morning roll call ("guard mount") equipped with their weapons. Def.'s Memorandum in Support of Mot. Summ. J. 4-5. Because only one officer was allowed to cross the red line at a time, officers usually experienced some wait time. Although Wackenhut did not mandate an arrival time for each person, the officers routinely came in to work prior to guard mount to ensure that they would be able to don their weapons and report to guard mount on time. The parties disagree as to the necessity of the officers arriving to work early. Regardless of their arrival time at the facility, officers were not considered "on the clock" until the start of guard mount.

After officers completed the weapons donning process, they had no scheduled work-related duties to perform prior to guard mount. Officers normally would drink coffee, read, socialize and take part in other similar personal activities. The officers were not, however, permitted to leave the premises during the period between donning their weapons and the start of guard mount.

The parties disagree as to whether it was mandatory that the officers be suited with their equipment by the time that guard mount began. The plaintiffs' position is that Wackenhut's procedure, which it refers to as a "management expectation", was that the officers were required to be fully equipped at the time they reported to guard mount. Wackenhut's explanation is that, although the employees may have been expected to report fully equipped, no employee was ever disciplined for failing to don all necessary equipment at the time he or she reported to guard mount.

Whether it was official policy or simply a commonly accepted practice, Wackenhut acknowledged its potential liability in an October 18, 2004, letter to its nuclear service clients, including Grand Gulf. In that letter, Richard Michau, President of Wackenhut's Nuclear Services, wrote:

> It has been industry practice at some of our client's nuclear sites to have officers retrieve their weapons prior to reporting to shift briefing. In a majority of these cases, the officers are not paid for the time retrieving their weapons and do not go on the clock until the start of shift briefing.... In the past, we have been successful in defending this practice. However, more recently, employees at several sites have challenged this

> practice....
>
> In several recent instances, our position that this time is not compensable has been met with stiff resistance by some Wage and Hour officials. They have advised us that they now consider arming time to be work time that employees should be paid for, and that this time should be recorded as work time for the purpose of calculating pay, including overtime.... We have concluded that, as a business matter, it would be best to change this practice and compensate employees for the time spent obtaining their weapons and other issued equipment.

Letter from Richard Michau, President, Wackenhut Nuclear Services, to Wackenhut Nuclear Services Clients (Oct. 18, 2004). Although this recommendation was made in 2004, no change was made at Grand Gulf until 2006.

In April 2006, Wackenhut modified its practices at the Grand Gulf facility. (Hicks Decl. 2.) Wackenhut's current procedure is that an officer's shift begins with guard mount, after which officers report to the armory for their equipment issue. (Hicks Decl. 2.) Officers are considered "on the clock" at the time guard mount begins and are compensated for the time spent in the donning process.

### B.  Post-Shift Procedures

At the end of an officer's shift, he or she must not leave the work post until relief has arrived. This requirement sometimes results in an officer having to work a few additional minutes past the scheduled end of his or her shift. In calculating an officer's compensation for additional time worked, Wackenhut would round the officer's compensable time to the nearest quarter hour.

Wackenhut's policy of rounding time is best illustrated by an example. If an officer works less than 9 minutes over the scheduled end time of his or her shift, the time is rounded down, the result being that the officer is not paid for the few additional minutes. If an officer works 9 minutes or more over the scheduled end time of his or her shift, the officer is paid for the entire quarter hour, resulting in the officer being paid for the additional minutes without having worked them.

### C.  The Instant Case

On June 27, 2007, the plaintiffs instituted the instant action, alleging that the defendants are liable to them for unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207. (Compl. ¶¶ 6,7.) Specifically, the officers seek unpaid wages and damages based on two theories: (1) that they are entitled to back pay for the time they spent donning required protective gear and subsequently waiting for guard mount to begin and (2) that Wackenhut's procedure of rounding post-shift time impermissibly resulted in the officers not being paid for all time worked. On April 14, 2008, the defendant filed its first Motion for Summary Judgment. After a continuance on the first motion, Wackenhut filed a second Motion for Summary Judgment on August 25, 2008. In its motion, the defendant seeks summary judgment on both issues. The plaintiffs also filed a Motion for Partial Summary Judgment on August 26, 2008. Therein, the plaintiffs ask for summary judgment

only on the issue regarding compensation for pre-shift activities. The defendant's Motion for Summary Judgment and the plaintiffs' Motion for Partial Summary Judgment now are before the Court.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is apposite "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[1] The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the nonmoving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be

---

[1] "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate Partnership v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (citations omitted).

believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. The nonmovant must instead come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is properly rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### B. Pre-Shift Compensation

The parties have filed cross motions for summary judgment on the issue of whether the defendant is liable to the plaintiffs for the pre-shift time the plaintiffs spent donning necessary equipment and waiting for guard mount to begin. Wackenhut construes the plaintiffs' suit as seeking compensation for two separate pre-shift periods of time: (1) any time between the time the officers entered the facility and the time they were admitted across the red line in the armory and (2) the time between crossing the red line in the armory and the actual beginning of guard mount. In their Reply

Memorandum in Support of Motion for Partial Summary Judgment, the plaintiffs clarify that they do not seek compensation for any time prior to the issuance process. Nevertheless, the plaintiffs' briefs do not make clear at what point in their opinion the issuance process begins. To clarify, the Court considers the issuance process to begin from the time the officer crosses the red line in the armory and commences the weapons donning process. All time spent from the time of arrival to the time the officer crosses the red line is considered a non-compensable, preliminary activity.[2]

The Court turns then to the plaintiffs' claim that they are entitled to compensation both for the time spent actually donning their protective gear and for the interval between the obtaining of their gear and the start of guard mount. The defendant counters with two arguments. First, the defendants claim that the time spent in the donning process qualifies as a de minimis activity

---

[2]   The Portal-to-Portal Act states that an employer will not be held liable under the FLSA for failure to compensate an employee for "activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences ... such principal activity or activities." 29 U.S.C. § 254(a)(2). Further, Supreme Court precedent is clear that time spent waiting to don protective clothing is a noncompensable, preliminary activity. IBP, Inc. v. Alvarez, 546 U.S. 21, 24 (2005) ("[U]nlike the donning of certain types of protective gear, which is always essential if the worker is to do his job, the waiting may or may not be necessary in particular situations or for every employee. It certainly is not 'integral and indispensable' in the same sense that the donning is.")

that is not compensable under the FLSA. Second, the defendant argues that the subsequent wait time, which it says does not benefit Wackenhut at all, is not converted into work time under the "continuous workday rule" simply by performance of the de minimis donning process.

1.  Is the time spent on the donning process a noncompensable de minimis activity?

In discussing whether the time spent donning protective wear is compensable, the Supreme Court has stated:

> [A]ctivities, such as the donning and doffing of specialized protective gear, that are 'performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1).'

IBP, 546 U.S. at 30 (emphasis added). As noted above, the plaintiffs were required to don the protective gear as a necessary part of their jobs. Accordingly, the actual donning process is compensable as an integral and indispensable part of the job, unless some exception applies.

The defendants argue that the time spent in the donning process is not compensable under the de minimis doctrine. "The de minimis rule provides that an employer, in recording work time, may disregard 'insubstantial or insignificant periods of time beyond

the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes.'" Mireles v. Frio Foods, Inc., 899 F.2d 1407, 1414 (5th Cir. 1990). The touchstone of the rule is administrative practicability.

The evidence provided creates a genuine issue of material fact as to Wackenhut's ability to calculate the time spent in the donning process and to compensate for such time.  Wackenhut argues that it was not able to calculate the time spent in the armory because it was bound to follow a single key issue log procedure. However, the fact that Wackenhut has subsequently modified its procedures and now compensates for the full time creates a question as to the practicability of such a procedure at the time in question.  Accordingly, the Court concludes that summary judgment is not appropriate regarding the issue of whether the time spent in the donning process constitutes de minimis activity.

b.  Is the time spent post-donning but prior to guard mount compensable?

The plaintiffs also seek compensation for the time spent after the donning process waiting for guard mount to begin.  They first argue that, under the continuous workday doctrine, any time between the first principal activity--donning protective gear--and the end of the workday is compensable.  Second, the plaintiffs argue that the wait time constitutes compensable work under the FLSA because it was performed primarily for Wackenhut's benefit.

Continuous Workday Doctrine

The plaintiffs argue that all time spent between donning protective equipment and the start of guard mount is compensable under the continuous workday doctrine. In so arguing, the plaintiffs misunderstand the doctrine. The continuous workday doctrine derives from a regulation issued by the Secretary of Labor that sought to clarify the interplay between a continuous workday and the Portal-to-Portal Act's exclusion of preliminary and postliminary activities. 29 C.F.R. § 790.6(b) reads:

> "Workday" as used in the Portal Act means, in general, the period between the commencement and completion on the same workday of an employee's principal activity or activities.... For example, a rest period or a lunch period is part of the "workday", and section 4 of the Portal Act therefore plays no part in determining whether such a period, under the particular circumstances presented, is or is not compensable.

Said differently, the continuous workday doctrine does not automatically make all activity, work-related or non-work-related, compensable. Rather, it clarifies that preliminary or postliminary activities taking place inside the workday are not automatically excluded by the Portal to Portal Act.

The plaintiffs base their argument in large part on IPB, Inc. v. Alvarez, where the Supreme Court concluded that time spent walking from a locker room to a production line is compensable under the FLSA. 546 U.S. at 524-25. The Court based its decision in part on the idea that the workday begins with the first

principal activity--there, changing into protective gear--and ends with the last principal activity.

The plaintiffs interpret the continuous workday doctrine and the IPB decision very broadly. Specifically, they argue that, since changing into protective gear is a principal activity, any activity following that principal activity necessarily is compensable work. This Court declines to extend the holding in IPB quite so far. In IPB, the Court concluded specifically that "walking time that occurs after the beginning of the employee's first principal activity" is compensable. Id. at 525. The Court does not go so far as to say that any event occurring after the first principal activity is compensable. Indeed, time spent walking directly from one principal activity to another does not raise the same issues presented in the instant case. Here, the plaintiffs are not seeking compensation for time spent walking from station to station. Rather, the plaintiffs ask to be compensated for waiting time, which is easily distinguishable from walking time. To be sure, walking time (directly from principal activity to principal activity) does not raise the issue of whether the time was spent predominately for the employee's or the employer's benefit. Furthermore, as discussed below, caselaw exists that addresses wait time, supporting the conclusion that there are instances throughout the workday where some time is not compensable. Accordingly, the Court concludes that the continuous

13

workday doctrine alone does not make the wait time at issue here compensable.

Does "Wait Time" Equal "Work"?

Even though it is not automatically compensable under the continuous workday doctrine, the wait time here may nevertheless be compensable if it constitutes work under the FLSA. The Fifth Circuit Court of Appeals has addressed the issue as to whether an employee is entitled to compensation for time spent waiting to work. "Whether an employee is entitled to pay for time spent waiting depends, in large part, on the manner in which the idle time is spent." Mireles, 899 F.2d at 1411. Specifically, the issue turns on whether the time is spent "predominately for the benefit of the employer" or whether the time "primarily benefits the employee." Id. (citations omitted).

Here, a genuine issue of material fact exists regarding whether the wait time prior to guard mount constitutes "work" under the FLSA. Specifically, the evidence is inconsistent as to whether the wait time predominately benefitted the employees or Wackenhut. The defendant argues that the employees did no work to benefit Wackenhut during the wait time, but rather used the time for their sole benefit. However, there is evidence which suggests that the failure of Wackenhut to assign arrival times required the officers to arrive early in order to avoid being late to guard mount. Further, a valid argument exists that Wackenhut benefitted

substantially by having officers on site available to work should the need arise. Additionally, testimony by some of the plaintiffs' witnesses indicates that there were occasions, although admittedly rare, where officers would be asked to perform work during this wait time. Accordingly, the Court concludes that summary judgment in favor of either party on this issue is not appropriate.

### C. Post-Shift Compensation

Only Wackenhut has moved for summary judgment on the issue of whether its policy of rounding time is permissible under the FLSA. Department of Labor Regulations acknowledge that there are circumstances where it may be permissible to round employees' starting and stopping times to the nearest quarter of an hour. 29 C.F.R. § 785.48. That regulation also notes that such a practice will be accepted only where it does not "fail[] to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). Wackenhut moves for summary judgment on this issue based only on limited deposition testimony that the process "all kind of evens out." Def.'s Memo. in Support of Mot. Summ. J. 23. Wackenhut has failed, however, to provide enough evidence to entitle it to a final ruling at this stage. The defendant has not provided any documentary evidence comparing the instances where its employees' work times were rounded up with the times they were rounded down. Accordingly, the Court is unable to decide whether the employees were paid for all time worked. Therefore, summary

judgment on this issue is not proper.

### D. Liquidated Damages and Statute of Limitations

The plaintiffs make two additional arguments in their motion. First, they claim that, in addition to back pay, the defendants are liable for liquidated damages, attorneys' fees and costs. In addressing the penalties for violating the FLSA, section 216(b) mandates that:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). An employer can avoid paying liquidated damages, however, if it "shows to the satisfaction of the court that the act or omission giving rise to [the FLSA suit] was in good faith and that [the employer] had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260.

Additionally, rather than the generally applicable two-year statute of limitations, the plaintiffs argue that the more-lenient three-year statute of limitations should apply to the instant case. Under Section 255, any action to enforce the FLSA must be commenced within two years after the cause of action accrues, unless such action arises out of a willful violation of the FLSA. 29 U.S.C. § 255(a). In cases of willful violations, a three year statute of

limitations applies.  29 U.S.C. § 255(a).

Even assuming that Wackenhut has violated the FLSA, both the liquidated damages argument and the statute of limitations argument hinge on Wackenhut's good faith, willfulness and reasonableness, or the lack thereof.  The parties have not provided sufficient evidence at this stage to allow the Court to determine these issues.  Therefore, the Court declines to make a ruling as to liquidated damages and the appropriate statute of limitations in these summary judgment proceedings.

### IV. CONCLUSION AND ORDER

Based upon the foregoing analysis and authorities,

**IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [**docket entry nos. 17, 44**] is **DENIED**.

**IT IS HEREBY ORDERED** that plaintiffs' Motion for Partial Summary Judgment [**docket entry no. 43**] is **DENIED**.

**SO ORDERED**, this the 19th day of November 2008.

            s/ David Bramlette

            **UNITED STATES DISTRICT JUDGE**